UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

|  |  |
|---|---|
| LUXOR TECHNOLOGY CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> GIGA ENERGY, INC., and AARON FOSTER, <br><br> Defendants. | CASE NO. 2:26-cv-00357-TL <br><br> ORDER ON MOTION FOR TEMPORARY RESTRAINING ORDER |

This matter is before the Court on Plaintiff Luxor Technology Corporation's Motion for a Temporary Restraining Order ("TRO"), Alternative Service on Defendant Aaron Foster, and Attorneys' Fees and Costs. Dkt. No. 13. Defendants Giga Energy, Inc., and Aaron Foster oppose Plaintiff's motion and, additionally, request an award of attorney fees. Dkt. No. 23. Having reviewed the Plaintiff's motion, Defendants' response, and the relevant record, the Court DENIES the motion.

ORDER ON MOTION FOR TEMPORARY RESTRAINING ORDER – 1

## I.    BACKGROUND

### A.    Parties

Plaintiff is Luxor Technology Corporation, a company that "suppl[ies] energy-related and hardware brokerage services to data center operators and other large energy-consuming customers." Dkt. No. 1 (Complaint) ¶ 1. Plaintiff "also assist[s] clients in sourcing and deploying specialized computing hardware and related electrical infrastructure and in structuring their participation in wholesale and retail energy markets." *Id.*

Defendants are Giga Energy, Inc. ("Giga"), allegedly a "direct competitor" of Plaintiff; and Aaron Foster, who worked for Plaintiff between September 2021 and November 2025 and has worked for Defendant Giga since December 2025. *Id.* ¶¶ 1, 10. Defendant Giga asserts that Defendant Foster was an independent contractor for, and not an employee of, Plaintiff. Dkt. No. 23 at 8. Defendant Giga also rejects Plaintiff's characterization of it as a direct competitor (*see id.* at 9–11), a dispute the Court finds unnecessary to resolve at this time.

### B.    Facts and Allegations

Put bluntly, Plaintiff alleges that Defendants have been poaching their employees and clients. Dkt. No. 1 ¶ 17. The problem, Plaintiff alleges, is "a systemic issue." *Id.* ¶ 19.

Defendant Foster began working for Plaintiff on or about September 26, 2021. *Id.* ¶ 24. Upon joining Plaintiff, Defendant Foster signed an agreement titled "Employee Confidential Information and Invention Assignment Agreement" (the "Foster Agreement"). Dkt. No. 1 ¶ 25; *see* Dkt. No. 1-2 (Foster Agreement). Despite the title of the Foster Agreement, however, Defendant Giga asserts that Defendant Foster operated as an independent contractor and was not Plaintiff's employee. *See* Dkt. No. 23 at 8. Defendant Foster asserts that he "incorporated a company called Electric City Digital Inc. in late 2021 for the purpose of serving as an independent contractor to Luxor." Dkt. No. 26 (Foster Decl.) ¶ 4.

Two parts of the Foster Agreement are particularly relevant here. First, in a confidentiality agreement comprising Section 1 of the contract, Defendant Foster promised, "At all times during and after my employment, I will hold in confidence and will not disclose, use, lecture upon, or publish any Confidential Information, except as required in connection with my work for Company, or as approved by an officer of Company." Dkt. No. 1-2 § 1.1. The Foster Agreement included a broad definition of what is considered "Confidential Information." *See id.* § 1.2. Second, the Foster Agreement included a so-called[1] non-solicitation agreement that comprised Section 5 of the contract. *See* Dkt. No. 1-2 § 5. The non-solicitation agreement "precludes [Defendant Foster] from soliciting, inducing, or attempting to induce any Luxor client or potential client to 'terminate, diminish, or materially alter in a manner harmful to the Company its relationship with Company' or 'purchase or contract for any Conflicting Services' or 'perform, provide or attempt to perform or provide any Conflicting Services for a Customer or Potential Customer.'" Dkt. No. 1 ¶ 23 (quoting Dkt. No. 1-2 §§ 5.4–5.6).

On November 3, 2025, Defendant Foster "downloaded a file from Luxor that contains 170 records, including the names of Luxor clients . . . ." Dkt. No. 1 ¶ 26. The Parties dispute whether Defendant Foster had permission or authorization from Plaintiff to do so. *Compare id.*, *with* Dkt. No. 23 at 12. On November 13, 2025, Defendant Foster terminated his relationship with Plaintiff. Dkt. No. 1 ¶ 28. And "at the end of December 2025," Defendant Foster began working for Defendant Giga. *Id.*

Plaintiff alleges that, "[i]mmediately upon joining Giga, Foster made use of the files[2]

---

[1] As discussed below, *see infra* Section III.A.1.b, Defendants argue that the "non-solicitation" agreement is more accurately considered a "noncompetition covenant." *Compare* RCW 49.62.010(4), *with* RCW 49.62.010(5).

[2] Notwithstanding Plaintiff's assertion here, it appears that Defendant Foster only downloaded one "file." In light of the lack of clarity as to what specific data Defendant Foster obtained from the download, this inconsistency in Plaintiff's pleading maintains some relevance.

ORDER ON MOTION FOR TEMPORARY RESTRAINING ORDER – 3

downloaded from Luxor and began to contact Luxor's clients in an attempt to divert their business from Luxor to Giga," in violation of both the confidentiality and non-solicitation agreements in the Foster Agreement. *Id.* Plaintiff alleges further that Defendant Foster "assisted Giga in soliciting additional Luxor employees to join Giga . . . ." *Id.* ¶ 29. Plaintiff alleges that Defendant Giga has "disregarded the post-employment contractual obligations owed by [Defendant Foster] to Luxor." *Id.* ¶ 32. Plaintiff alleges further that the alleged inducement of Defendant Foster to violate the Foster Agreement is part of a concerted effort at Defendant Giga to "leverag[e] . . . prior relationships for Giga's benefit, even if it meant breaching any post-employment contractual obligations." *Id.*[3]

On January 30, 2026, Plaintiff filed the instant lawsuit against Defendants, pleading four causes of action: (1) breach of contract, against Defendant Foster (Dkt. No. 1 ¶¶ 41–46); (2) violation of the federal Defend Trade Secrets Act ("DTSA"), against all Defendants (*id.* ¶¶ 47–58); (3) violation of the Washington Uniform Trade Secrets Act ("WUTSA"), against all Defendants (*id.* ¶¶ 59–70); and (4) state-law tortious interference with business expectancy, against Defendant Giga (*id.* ¶¶ 71–78). On February 12, 2026, Plaintiff filed the instant motion for a TRO. Dkt. No. 13. On February 18, 2026, Defendants responded. Dkt. No. 23. In its motion, Plaintiff seeks:

> an order granting a TRO as follows: (a) enjoining Foster from using or disclosing Luxor's trade secrets, including the CRM file and directing the return of the same to Luxor; (b) enjoining Defendants from soliciting, directly or indirectly, Luxor's Customers and Potential Customers in the Energy Management Line of Business (which shall include those services offered by Giga Power Systems) or the Hardware Line of Business; and (c) enjoining Foster from soliciting, directly or indirectly, any active

---

[3] Plaintiff makes allegations against Collin Kelly, a former employee of Plaintiff now employed by Defendant Giga, that are similar to those against Defendant Foster. *See* Dkt. No. 1 ¶¶ 4, 20–23. Plaintiff has not named Kelly as Defendant, however, and Kelly is not a party to this lawsuit.

ORDER ON MOTION FOR TEMPORARY RESTRAINING ORDER – 4

Luxor employee, contractor, or consultant pursuant to the Foster Agreement.

Dkt. No. 13 at 37–38. Plaintiff also seeks, as part of its motion, a court order permitting it to "serve Foster by international mail [at] his address in Canada and by email to Foster's counsel . . . ." *Id.* at 38.

## II.    LEGAL STANDARD

"Temporary restraining orders . . . are governed by the same standard applicable to preliminary injunctions." *Kathrens v. Zinke*, 323 F. Supp. 3d 1142, 1148 (D. Mont. 2018) (citing *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832 n.7 (9th Cir. 2001)). A TRO, like a preliminary injunction, is an extraordinary remedy that is "never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

> To obtain a preliminary injunction, a plaintiff must establish that (1) it is likely to prevail on the merits of its substantive claims, (2) it is likely to suffer imminent, irreparable harm absent an injunction, (3) the balance of equities favors an injunction, and (4) an injunction is in the public interest.

*All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 490 (9th Cir. 2023) (citing *Winter*, 555 U.S. at 20, 22–23). Ninth Circuit courts evaluate these factors on a "sliding scale"—that is, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and the injunction is in the public interest." *Arc of Cal. v. Douglas*, 757 F.3d 975, 983 (9th Cir. 2014) (citation modified). "The 'serious questions' standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Kathrens*, 323 F. Supp. 3d at 1149 (citing *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

1132 (9th Cir. 2011)). "In deciding a motion for preliminary injunction, the Court is not required to decide doubtful and difficult questions of law or disputed questions of fact." *Hyphy Music Inc. v. Cruz*, No. C23-700, 2025 WL 1580909, at *14 (E.D. Cal. June 4, 2025) (citing *Int'l Molders' & Allied Workers' Loc. Union No. 164 v. Nelson*, 799 F.2d 547, 551 (9th Cir. 1986)). Where "unresolved issues and factual disputes are too expansive for the Court to find that [the movant] has demonstrated a likelihood of success on the merits of the claim," it is appropriate to deny injunctive relief. *Id.* (collecting cases).

### III.    DISCUSSION

Plaintiff's motion founders at the first *Winter* factor, likelihood of success on the merits. Plaintiff has failed to establish a likelihood of prevailing on the merits of any of its four causes of action. "The first [*Winter*] factor 'is a threshold inquiry and is the most important factor.'" *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (quoting *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020)). "Thus, a 'court need not consider the other factors' if a movant fails to show a likelihood of success on the merits." *Id.* (quoting *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017)). The Court will examine each of Plaintiff's claims in turn.

### A.    First Claim: Breach of Contract Against Defendant Foster

Under Washington law, there are three elements to a breach-of-contract claim: (1) existence of a contract; (2) breach of that contract; and (3) damages. *See Corner Computing Sols. v. Google LLC*, 750 F. Supp. 3d 1208, 1214 (W.D. Wash. 2024) (citing *Univ. of Wash. v. Gov't Emps. Ins. Co.*, 200 Wn. App. 455, 467, 404 P.3d 559 (2017)). Defendants argue that Plaintiff has failed to establish any of the three elements, thus rendering success on the merits unlikely. *See* Dkt. No. 23 at 17–23.

**1.      Existence of a Contract**

Defendants argue that the contract at issue in Plaintiff's claim—the Foster Agreement—is not an enforceable "noncompete agreement" under Washington law.[4] *See* Dkt. No. 23 at 17. But in so doing, Defendants ignore half of Plaintiff's breach-of-contract claim. Plaintiff has alleged that Defendant Foster breached *both* the "confidentiality and non-solicitation clauses" of the Foster Agreement. *See* Dkt. No. 1 ¶ 28.[5]

Importantly, the Foster Agreement includes a severability clause that provides for the enforcement of the confidentiality agreement even if the "non-solicitation" agreement is unenforceable. Section 13.2 of the Foster Agreement provides that "[i]f any portion of this Agreement is, for any reason, held to be invalid, illegal or unenforceable, such invalidity, illegality or unenforceability will not affect the other provisions of this Agreement, and this Agreement will be construed as if such provision had never been contained in this Agreement." Dkt. No. 1-2 § 13.2. That is to say, even if Defendants are correct about the unenforceability of the "non-solicitation" agreement, the confidentiality agreement could still be enforced. *See McKee v. AT & T Corp.*, 164 Wn.2d 372, 403, 191 P.3d 845 (2008) ("We give effect to severability clauses if we can easily excise the unconscionable provision without essentially rewriting the contract.").

**a.      Confidentiality**

Defendants do not address Plaintiff's claim as to confidentiality, and they present no argument as to the validity of the confidentiality provisions of the Foster Agreement. Moreover, as to severability, Defendants do not presented any argument as to whether Washington law

---

[4] Washington law refers to such agreements as non-competition covenants. *See* RCW 49.62.010(4).

[5] As discussed above, the confidentiality agreement consists of Section 1 of the Foster Agreement; the non-solicitation agreement consists of Section 5.

would permit or preclude partial enforcement of the Foster Agreement—that is, without its allegedly unenforceable non-competition portion. Absent any argument on the issue from the Parties, the Court will not take up the question here. Consequently, without such argument before it, the Court is presented with Plaintiff's unrebutted assertion that Plaintiff entered into a valid and enforceable *confidentiality* agreement with Defendant Foster. *See* Dkt. No. 13 at 21 (citing confidentiality portion of Foster Agreement). Put differently, there is presently no dispute as to whether Plaintiff and Defendant Foster entered into a valid and enforceable confidentiality agreement, and the Court will not endeavor to gin one up. (In any event, confidentiality agreements are expressly excluded from the definition of noncompetition covenants under Washington law. *See* RCW 49.62.010(4).)

Therefore, as to confidentiality, the Court finds that there is an enforceable contract between Plaintiff and Defendant Foster.

### b.    Non-competition Covenant

Plaintiff alleges that Defendant Foster breached Section 5 of the Foster Agreement, captioned "No Solicitation of Employees, Consultants, Contractors, or Customers or Potential Customers." *See* Dkt. No. 1 ¶¶ 28–29; Dkt. No. 1-2 § 5. In opposing Plaintiff's motion for a TRO, Defendants argue that what Plaintiff has labeled a "non-solicitation" agreement is actually a non-competition covenant. *See* Dkt. No. 23 at 17–18. The distinction is important, because under Washington law, non-competition covenants are very different from non-solicitation agreements. *See* RCW 49.62.010(4) (expressly excluding "nonsolicitation agreement" from definition of non-competition covenant). Particularly relevant here, non-competition covenants are subject to rules that govern their enforceability that are not applicable to non-solicitation agreements. *See, e.g.*, RCW 49.62.020, 49.62.030, 49.62.050.

As to the nature of Section 5 of the Foster Agreement, the Court agrees with Defendant: Under Washington law, these "non-solicitation" provisions are more properly considered a non-competition covenant. Pursuant to statute,

> "Noncompetition covenant" . . . includes every written or oral covenant, agreement, or contract by which an employee or independent contractor is prohibited or restrained from engaging in a lawful profession, trade, or business of any kind. A "noncompetition covenant" also includes an agreement that directly or indirectly prohibits the acceptance or transaction of business with a customer.

RCW 49.62.010(4).

Under Section 5 of the Foster Agreement, Defendant Foster may not:

> solicit, induce or attempt to induce any Customer or Potential Customer (as defined [in § 5.6]), to terminate, diminish, or materially alter in a manner harmful to Company its relationship with Company;

> solicit or assist in the solicitation of any Customer or Potential Customer to induce or attempt to induce such Customer or Potential Customer to purchase or contract for any Conflicting Services;

> or perform, provide or attempt to perform or provide any Conflicting Services for a Customer or Potential Customer.

Dkt. No. 1-2 §§ 5.4–5.6. Defendants argue that these contractual provisions "restrict interactions with 'Prospective Customers,' and . . . prohibit[] Foster from 'perform[ing]' or 'provid[ing]' any 'Conflicting Services' for *any* customer." Dkt. No. 23 at 18. This restriction and prohibition, Defendants assert, "'directly or indirectly prohibit[] the acceptance or transaction of business with a customer . . . ,'" thus rendering it—by definition—a non-competition covenant. *Id.* (quoting RCW 49.62.010(4)). The Court agrees. By precluding Defendant Foster from "induc[ing] or attempt[ing] to induce [a customer] to purchase or contract for any Conflicting Services," the Foster Agreement blocks Defendant Foster from "accept[ing] or

transact[ing] . . . business with a customer." Similarly, the prohibition on "perform[ing] or provid[ing] any Conflicting Services for a Customer or Potential Customer" also blocks Defendant Foster from "accept[ing] or transact[ing] . . . business with a customer." The statutory language is broad and unambiguous and, as a recent textual addition to the law, it has not been constrained or qualified by Washington courts.[6] *See* 2024 Wash. Sess. Laws ch. 36 § 2. Therefore, the Court concludes that Section 5 of the Foster Agreement represents a non-competition covenant between Defendant Foster and Plaintiff.

The next question is whether the terms of this non-competition covenant are enforceable. Defendants argue that they are not. Defendant Foster "does not meet the income threshold for enforcement of a noncompete against an independent contractor," which Defendants assert is $308,485.43. Dkt. No. 23 at 18. The independent-contractor threshold applies here, Defendants assert, because Defendant Foster was never an employee of Plaintiff. Dkt. No. 23 at 8; *see also* Dkt. No. 26 ¶ 4. Rather, Defendant Foster avers that he worked for Plaintiff as an independent contractor. Dkt. No. 26 ¶ 4. Defendant Foster asserts further that he "incorporated a company called Electric City Digital Inc. in late 2021 for the purpose of serving as an independent contractor of Luxor." *Id.*[7]

---

[6] The breadth of the language is evident when compared to the statutory language that defines a non-solicitation agreement. The definition of a non-solicitation agreement limits the scope of such an agreement to a prohibition on the "solicitation by an employee, upon termination of employment . . . of any current customer of the employer to cease or reduce the extent to which it is doing business with the employer." RCW 49.62.010(5).

[7] The Court recognizes that Defendant Foster's Declaration (Dkt. No. 26) is self-serving, and that Defendant Foster has not provided documentary evidence, such as a tax return or other such record, to substantiate his status as an independent contractor. Nevertheless, Defendant Foster executed his Declaration under penalty of perjury. *See id.* at 9. It thus "constitute[s] record evidence that" Plaintiff "did in fact hire [Defendant Foster] as [an] independent [contractor]," which the Court credits at this procedural posture. *MPAY Inc. v. Erie Custom Computer Applications, Inc.*, 970 F.3d 1010, 1018 (8th Cir. 2020). In any event, the Court need not resolve the independent contractor versus employee question; the mere existence of the dispute detracts from Plaintiff's ability to show a likelihood of success on the merits. *See Hyphy Music*, 2025 WL 1580909, at *14. The Court notes further that, had Plaintiff opted to pursue a preliminary injunction, as opposed to an emergency TRO, it would have been afforded the opportunity to file a reply brief that might have responded to Defendants' arguments. *Compare* LCR 65(b)(5), *with* LCR 7(b)(3), (d)(4).

ORDER ON MOTION FOR TEMPORARY RESTRAINING ORDER – 10

Under RCW 49.62.030(1), "A noncompetition covenant is void and unenforceable against an independent contractor unless the independent contractor's earnings from the party seeking enforcement exceed" a statutory minimum that is "adjusted annually in accordance with RCW 49.62.040." The State Department of Labor and Industries calculates such adjustments. RCW 49.62.040. In 2025, an independent contractor needed to earn at least $308,485.43 from the entity seeking to enforce a noncompetition agreement against them. *See* Noncompetition Enforceability Thresholds for 2025, Wash. State Reg. 24-20-097 (Sept. 30, 2024).[8] Defendants assert that Defendant Foster's "2025 compensation fell short of [that] minimum." Dkt. No. 23 at 18 (citing Dkt. No. 26 ¶ 5). It is Plaintiff's burden to "establish the existence of a valid and enforceable contract." *Citoli v. City of Seattle*, 115 Wn. App. 459, 476, 61 P.3d 1165 (2002). On the present record, they have not done so.

Defendants argue further that, "[e]ven when statutory requirements are satisfied, restrictive covenants must pass Washington's established three-part reasonable test." Dkt. No. 23 at 19 (citing *Emerick v. Cardiac Study Ctr., Inc., P.S.*, 189 Wn. App. 711, 721–22, 357 P.3d 696 (2015)). Defendants assert that Plaintiff cannot meet its burden on any of the three components of the test. *Id.* at 20. Because Plaintiff has not established the statutory requirements for the enforcement of a noncompetition covenant, the Court need not consider the reasonableness test.

In sum, on the record before it, given the centrality of the question of whether Defendant Foster was an employee or independent contractor, the Court concludes that Plaintiff has not sufficiently demonstrated that it will establish the existence of an enforceable non-competition

---

[8] *See also* Washington State Department of Labor and Industries, "Non-Compete Agreements," available at https://www.lni.wa.gov/workers-rights/workplace-policies/Non-Compete-Agreements [https://perma.cc/QZ2A-N3C9].

ORDER ON MOTION FOR TEMPORARY RESTRAINING ORDER – 11

covenant. Therefore, as to the non-competition part of Plaintiff's breach-of-contact claim, Plaintiff has not established a likelihood of success on the merits.

### 2. Breach of the Contract

As to the confidentiality agreement, for which the Court has determined that there *is* an enforceable contract, the analysis continues to the second element of the claim: breach of the contract. Plaintiff asserts that "Foster breached Section 1 [of the Foster Agreement] by downloading a file containing 170 customer-related records from Luxor's CRM software ten days before he left Luxor," and that "Foster continues to retain a copy of Luxor's CRM file today." Dkt. No. 13 at 22. Defendants argue that Plaintiff "provides no competent evidence that Foster used or disclosed confidential information after separating from Luxor." Dkt. No. 23 at 21.

As to the first allegation, regarding the download, Defendants assert that "the download occurred as part of Luxor's ordinary offboarding and account-handover process, which Foster performed routinely in his managerial role, including exporting CRM data into spreadsheet form to complete missing notes and reassign accounts at management's direction and with the involvement of the COO." *Id.* For its part, Plaintiff alleges that Defendant Foster performed the download "without authorization." Dkt. No. 1 ¶ 26; *see also* Dkt. No. 13 at 14. Such an unauthorized download would be violative of the contract. *See* Dkt. No. 1-2 § 1.1.

On the record before it, the Court discerns a tie. Defendant Foster avers that he downloaded the material under the supervision of Plaintiff's COO, Ethan Vera. *See* Dkt. No. 26 ¶¶ 17–18. Nick Hansen, Plaintiff's CEO, avers that the download occurred "without permission." Dkt. No. 15 (Hansen Decl.) ¶ 26. Neither side presents evidence that might break the deadlock. On a motion for a TRO or preliminary injunction, a "likelihood" of success on the merits suggests something more convincing that fifty-fifty. *See, e.g.*, *Ladenburg Thalmann & Co. Inc.*

*v. Oragenics, Inc.*, No. C24-21431, 2024 WL 2945490, at *1 (S.D. Fla. May 3, 2024), *report and recommendation adopted* 2024 WL 2938821 (June 11, 2024) ("[A] prediction of victory is overly optimistic when the evidence reveals an even-steven split of 50–50 odds. A plaintiff, therefore, should not obtain injunctive relief if the chances of prevailing are evenly matched.").

Moreover, pursuant to the contractual language, it is not just the *download* per se that might represent a breach. In presenting both its claim (Dkt. No. 1) and its argument here (Dkt. No. 13), Plaintiff cites the provision of the Foster Agreement that "prohibited Foster from disclosing, using, downloading, or retaining Confidential information 'except as required in connection with [his] work for [Luxor].'" Dkt. No. 13 at 22 (citing Dkt. No. 1-2 § 1.1). On this particularity—that is, what Defendant Foster *did* with the downloaded data—Defendant Foster avers that he downloaded the data to complete missing notes and reassign accounts at management's direction prior to his leaving. *See* Dkt. No. 26 ¶¶ 15–17. Defendant Foster further asserts, "I have not accessed or used the file since my departure from Luxor. Nor have I created copies or derivative materials from the file." Dkt. No. 26 ¶ 19. Absent from Plaintiff's motion is evidence—even so much as an attached self-serving declaration or affidavit—to indicate that Defendant Foster did anything with the downloaded data that was not "required in connection in his work for" Plaintiff. This evidentiary inequality would seem to tip the balance away from a likelihood of success on the merits. As Defendants assert, "Luxor concedes that [Defendants' counsel] represents that Foster has not accessed, used, copied, or derived any material from the .csv file, and Foster confirms that fact. . . . Luxor also offers no evidence that Luxor data was accessed, uploaded to Giga systems, shared with Giga personnel, or used in sales, pricing, or strategy after [Defendant Foster] joined Giga." Dkt. No. 23 at 21. Upon review of the record before it, the Court agrees. The evidence is simply not there.

ORDER ON MOTION FOR TEMPORARY RESTRAINING ORDER – 13

As to the second part of the breach-of-confidentiality allegation—that Defendant Foster "continues to retain a copy of Luxor's CRM file today" (Dkt. No. 13 at 22)—the Foster Agreement prohibits Defendant Foster from "retain[ing] for [his] personal use" "Company information or documentation to which [he] ha[s] access during [his] employment, regardless of whether it contains Confidential Information . . . ." Dkt. No. 1-2 § 1.1. Given Defendant Foster's testimony that he never "accessed, used, copied, or derived any material" from the downloaded file, there appears to have been no use *at all* of the retained Company information, personal or otherwise. Nor, for that matter, does Plaintiff present any *evidence* of improper use. Plaintiff's assertion that "[i]mmediately upon joining Giga, Foster used his knowledge of Luxor's trade secrets" is unsubstantiated with any record evidence. Dkt. No. 13 at 14. The Court agrees with Defendants' observation that "Luxor provides no competent evidence that Foster used or disclosed confidential information after separating from Luxor." Dkt. No. 23 at 21. In the absence of any evidence to support that Defendant Foster's retention of the disputed data was contractually improper, the Court will not presume as much.

*    *    *

In sum, Plaintiff's breach-of-contract claim does not present a likelihood of success on the merits. As to non-competition, Plaintiff has not adequately established the existence of an enforceable contract. As to confidentiality, Plaintiff has not adequately established breach. Therefore, the Court need not consider whether Plaintiff has established damages with respect to either part.

**B.    Second and Third Claims: Defend Trade Secrets Act and Washington Uniform Trade Secrets Act**

"The elements of a DTSA or [W]UTSA claim are substantially similar." *Traverse*

*Therapy Servs., PLLC v. Sadler-Bridges Wellness Grp., PLLC*, No. C23-1239, 2024 WL 381180, at *3 (W.D. Wash. Feb. 1, 2024) (comparing 18 U.S.C. § 1839(5), *with* RCW 19.108.010(2)). "A plaintiff asserting a DTSA or [W]UTSA claim must establish (1) the existence of a protectable trade secret, and (2) facts constituting misappropriat[ion]." *Id.* (citing *NW Monitoring LLC v. Hollander*, 534 F. Supp. 3d 1329, 1336 (W.D. Wash. 2021).

### 1.    Existence of a Protectable Trade Secret

"The definition of a trade secret is broad." *NW Monitoring*, 534 F. Supp. 3d at 1336 (citing RCW 19.108.010(4)). But there are two requirements: First, "the trade secret must derive 'independent economic value, actual or potential, from not being generally known . . . .'" *Id.* (citation omitted). Second, the trade secret "must be protected by reasonable efforts." *Id.* (citation modified).

Defendants argue that Plaintiff has not sufficiently identified anything that could be considered a "trade secret" under DTSA or WUTSA. *See* Dkt. No. 23 at 24. More specifically, Defendants assert that Plaintiff has failed to "establish . . . that the . . . 'information meets the requirements for a trade secret.'" *Id.* (quoting *Barrett Bus. Servs., Inc. v. Colmenero*, No. C22-3122, 2022 WL 21320240, at *4 (E.D. Wash. Oct. 19, 2022)).

From the face of Plaintiff's pleading and motion, it is not entirely clear what specific "trade secrets" Defendants have allegedly misappropriated. The Complaint refers to "a file from Luxor that contains 170 records, including the names of Luxor clients . . . ." Dkt. No. 1 ¶ 26. But the Complaint also refers to *files*—plural—an inconsistency that muddies the picture of what Defendant Foster allegedly took. *Id.* ¶¶ 27, 28, 36. Further, the Complaint references a "client list," which again suggests a singular document or file. *Id.* ¶ 50. Finally, Plaintiff's motion discusses "Customers and Potential Customers, including their contact information, purchase history, and future needs and wants; Luxor's pricing information; and Luxor's marketing

strategies and product roadmaps." Dkt. No. 13 at 24 (citing Dkt. No. 15 ¶¶ 11, 19). These data, Plaintiff argues, "constitute[] trade secrets." *Id.* That may be so. But Plaintiff does not draw any connection between the "170 records" that were allegedly misappropriated—whether in one or many files—and this rather lengthier description of what constitutes trade secrets. In other words, Plaintiff never asserts that contact information, purchase history, future needs and wants, pricing information, and marketing strategy and product roadmaps are actually represented in the allegedly misappropriated file (or files). Plaintiff's CEO avers that the "170 records" were "customer-related," and he describes the larger reservoir of data from which the 170 records were drawn as containing "contact information for Customers and Potential Customers and their prior purchase history and future needs and wants." Dkt. No. 15 ¶ 26. But it is unclear whether contact information, prior purchase history, and future needs and wants were actually included within the 170 purportedly "customer-related" records. The only common denominator among Plaintiff's multiple attempts to describe the trade secrets at issue here is the names of Plaintiff's customers. In short, if there is a trade secret to be found in this case, as pleaded, it can only be represented by the "170 records, including the names of Luxor clients," that Defendant Foster is unambiguously alleged to have taken without permission.

Still, even a list of names can qualify as a trade secret. "A customer list is one of the types of information which can be a protected trade secret if it meets the criteria of the Trade Secrets Act." *Ed Nowogroski Ins., Inc. v. Rucker*, 137 Wn.2d 427, 440, 971 P.2d 936 (1999). "Trade secret protection will not generally attach to customer lists where the information is readily ascertainable." *Id.* at 441. "Briefly expressed, whether a customer list is protected as a trade secret depends on three factual inquiries: (1) whether the list is a compilation of information; (2) whether it is valuable because unknown to others; and (3) whether the owner has made reasonable attempts to keep the information secret." *Id.* "[I]f information is readily

ascertainable from public sources such as trade directories or phone books, then customer lists will not be considered a trade secret." *Pac. Aerospace & Electronics, Inc. v. Taylor*, 295 F. Supp. 2d 1205, 1211 (E.D. Wash. 2003). But "[g]enerally, taking an employer's confidential customer list without permission is a trade secret misappropriation." *Thola v. Henschell*, 140 Wn. App. 70, 78, 164 P.3d 524 (2007).

Only two of these three elements are established here. Although case law indicates that the criteria are relatively undemanding, Plaintiff has failed to satisfy them. *See A.G. Design & Assocs., LLC v. Trainman Lantern Co., Inc.*, No. C07-5158, 2009 WL 230083, at *3 (W.D. Wash. Jan. 30, 2009). In *A.G. Design and Associates*, a court in this District found that a customer list qualified as a trade secret because: (1) "the customer list is a compilation of information about A.G.'s customers"; (2) "the information's value is at least slightly derived from its unavailability to others"; and (3) relevant documentation included "confidentiality provisions." *Id.* Here, as to the first element, the Court struggles to conceive of any list, irrespective of its subject matter, that is not a "compilation of information"; the purpose of a list, after all, is to compile data. An assemblage of the names of Plaintiff's customers certainly qualifies under such a broad definition. As to the third element, the confidentiality agreement in the Foster Agreement represents a reasonable effort to keep the information secret. *See id.* For their part, Defendants insist that Plaintiff could have done more to keep the information secret and assert that Plaintiff "employed lax security." Dkt. No. 23 at 25. But Defendants offer no standard, other than their own opinion, of what constitutes reasonable efforts. The court in *A.G. Design and Associates* found that written confidentiality provisions sufficed. *A.G. Design & Assocs.*, 2009 WL 230083, at *3. If Defendants disagree, and it appears that they do, they do not provide any authority that endorses their disagreement. A conclusory assertion of

unreasonableness is, without further reference to relative comparators or an absolute standard, unpersuasive.

As to the second element, however, there is no indication in the record that the customer list's value derived from its confidentiality. As discussed above, Plaintiff has not adequately demonstrated that the allegedly misappropriated file contained anything more than the names of customers. Plaintiff's CEO avers that the "proprietary and confidential information" about its customers "has significant economic and competitive value to Luxor, and improper disclosure and use of the same by competitors like Giga would cause Luxor irreparable injury." Dkt. No. 15 ¶ 9. But this is a conclusory statement, unsubstantiated by evidence. Plaintiff asserts in its motion that "[i]t took Luxor years to cultivate relationships with Customers and significant resources to develop its competitive pricing, product roadmaps, and marketing strategies." Dkt. No. 13 at 24–25. But as the Court has discussed, Plaintiff has not sufficiently alleged that this is the information that Defendants misappropriated. And nothing in either the Hansen Declaration or Plaintiff's motion clearly asserts—with or without evidentiary support—that the *secrecy* of the identity of Plaintiff's customers was, in and of itself, *valuable*. Simply put, Plaintiff has not shown that the customer list was "valuable because [it was] unknown to others."

Plaintiff's position is further undermined by its public docket submissions. Plaintiff cites as evidence of the alleged misappropriation a LinkedIn post wherein one of Defendant's employees "posted that Giga sold eight mobile datacenters to a Luxor customer, and that each of these datacenters houses 336 S21+ ASICs that Luxor could have also sold through its Hardware Line of Business." Dkt. No. 13 at 26 (citing Dkt. No. 15 ¶ 24 and Dkt. No. 15-4 at 2). But the LinkedIn post, which is attached as an exhibit to the Hansen Declaration, only identifies "A.R.T. Digital Holdings Corp" as the company that purchased the mobile datacenters. Dkt. No. 15-4 at 2. The post makes no mention of A.R.T. Holdings Corp's identity as one of Plaintiff's customers.

ORDER ON MOTION FOR TEMPORARY RESTRAINING ORDER – 18

It is thus *Plaintiff*, by way of its public filings here, that definitively establishes A.R.T. Digital Holdings Corp as a "Luxor customer." Plaintiff's unsolicited outing of one of its own customers—the disclosure, that is, of a purportedly valuable secret—casts doubt on its position that the secrecy of the identity of its customers is inherently and necessarily valuable.

In sum, Plaintiff has not adequately established that the allegedly misappropriated record constitutes a trade secret.

### 2.    Facts Constituting Misappropriation

Because the first element of a DTSA and/or WUTSA claim has not been established, the Court need not consider the second here.

*        *        *

Plaintiff has not demonstrated a likelihood of success on the merits as to its DTSA and WUTSA claims.

### C.    Fourth Claim: Tortious Interference

There are five elements to a claim for tortious interference with a contractual relationship or business expectancy:

> (1) the existence of a valid contractual relationship or business expectancy; (2) that defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) that defendants interfered for an improper purpose or used improper means; and (5) resultant damage.

*Leingang v. Pierce Cnty. Med. Bureau, Inc.*, 131 Wn.2d 133, 157, 930 P.2d 288 (1997). Here, Plaintiff's claim fails at the fourth element.

"A plaintiff needs to show either improper means *or* an improper purpose, not both, to establish the fourth element of their tortious interference claim." *Zunum Aero, Inc. v. Boeing Co.*, No. C21-896, 2022 WL 3346398, at *12 (W.D. Wash. Aug. 12, 2022) (citing *Pleas v. City of*

ORDER ON MOTION FOR TEMPORARY RESTRAINING ORDER – 19

*Seattle*, 112 Wn.2d 794, 803–04, 774 P.2d 1158 (1989)). "Interference for improper purpose is interference with an intent to harm the plaintiff, and interference by improper means is interference that violates a statute, a regulation, a recognized rule of common law, or an established standard of the trade or profession." *Id.* (quoting 6A Wash. Practice: Wash. Pattern Jury Instructions: Civil WPI 352.03 (7th ed. 2022)) (citation modified).

As to improper purpose, Plaintiff presents no evidence or argument to suggest that Defendants specifically intended to harm Plaintiff. As to improper means, Plaintiff predicates its tortious-interference claim upon the strength of its other three claims. That is, Defendants acted improperly by breaching the Foster Agreement and/or violating the DTSA and WUTSA. *See* Dkt. No. 13 at 29. But as discussed above, the Court has not found a likelihood of success on the merits for any of Plaintiff's first three claims. As to breach, the Court has found that, on the record before it, Plaintiff has not established the existence of a non-competition covenant, nor has it established the breach of a confidentiality agreement. And as to DTSA and WUTSA, the Court has found that Plaintiff had not adequately established that the allegedly misappropriated record or records here constituted a trade secret. Plaintiff does not provide any other basis on which to find improper means, such as an established standard of the trade or profession.

Therefore, the Court finds that Plaintiff has not established a likelihood of success on the merits of its tortious interference claim.

\*    \*    \*

In sum, Plaintiff has failed to show a likelihood of success on the merits for any of its four causes of action. Nor has Plaintiff demonstrated "serious questions" going to the merits of its claims; the likelihood of success of all four claims can be reasonably determined on the record before the Court. *See Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (defining "serious questions" as "questions which cannot be resolved one way or the other at the

ORDER ON MOTION FOR TEMPORARY RESTRAINING ORDER – 20

hearing on the injunction and as to which the court perceives a need to preserve the status quo lest one side prevent resolution of the questions or execution of any judgment by altering the status quo"). Therefore, the Court need not examine the latter three *Winter* elements. *See Baird*, 81 F.4th at 1040.

**D.      Fees and Costs**

Defendants argue that under Washington law, "when an employer attempts to enforce a noncompete or restraint that is void or unenforceable under the Act, the worker is entitled to statutory relief, including the greater of actual damages or $5,000, plus reasonable attorneys' fees, expenses, and costs incurred in defending against the unlawful restraint." Dkt. No. 23 at 34 (citing RCW 49.62.080(2)–(3)). But Defendants misstate the law. The statute does not assign liability to "an employer [that] attempts to enforce a noncompete or restraint that is void or unenforceable under the Act," as Defendants assert. Rather, liability attaches when "a court or arbitrator *determines* that a noncompetition covenant" violates the statute. RCW 49.62.080(2) (emphasis added). Here, the Court has made no such definitive determination. Pursuant to the *Winter* analysis, the Court's decision here is based on probabilities and the relative strengths of the Parties' arguments. That the Court finds that Plaintiff will not likely be successful in its attempt to enforce the non-competition covenant is not equivalent to a judicial determination that the covenant *is* void or unenforceable. *See, e.g.*, "Determination," *Black's Law Dictionary* (12th ed. 2024) (defining "determination" as "[t]he act of deciding something officially; esp., a *final* decision by a court" (emphasis added)).

Therefore, the Court finds Defendants' request premature and declines to award costs and fees at this time.

## IV.    ALTERNATIVE SERVICE

Plaintiff includes within its Motion a request that the Court authorize alternative service on Defendant Foster. *See* Dkt. No. 13 at 34–37. A motion for alternative service is a separate motion from a motion for a temporary restraining order. The former is governed by Local Civil Rule 7, which contemplates it as a 21-day motion. LCR 7(d)(3). The latter is governed by Local Civil Rule 65, which provides for an accelerated and truncated—i.e., no reply briefs are permitted—briefing schedule. *See* LCR 65(b)(5). Based on the same facts and argument that Plaintiff has marshaled in support of its request for a temporary restraining order, Plaintiff asserts that "time is of the essence" with respect to alternative service. *See* Dkt. No. 13 at 36–37. As discussed above, however, and as evidenced by its denial of a TRO, the Court is not persuaded by Plaintiff's assertions that this case is a matter of extraordinary urgency, and the Court will not treat Plaintiff's request for alternative service as an emergency that necessitates a departure from the ordinary briefing schedule of Local Civil Rule 7. The requested relief is therefore DENIED WITHOUT PREJUDICE. If Plaintiff persists in its position that alternative service is necessary, Plaintiff may file a separate motion on the issue.

## V.    CONCLUSION

Accordingly, Plaintiff's Motion for Temporary Restraining Order (Dkt. No. 13) is DENIED.

Dated this 25th day of February 2026.

Tana Lin
United States District Judge

ORDER ON MOTION FOR TEMPORARY RESTRAINING ORDER – 22